HENRY MUHLKER, Respondent and Appellant, *v.* THE NEW AND HARLEM RAILROAD COMPANY et al., Appellants and Respondents.

RAILROADS — NEW YORK AND HARLEM RAILROAD COMPANY NOT LIABLE FOR CONSEQUENTIAL DAMAGES RESULTING FROM ERECTION OF STEEL VIADUCT UPON WHICH ITS TRAINS ARE RUN IN AND THROUGH, FOURTH AVENUE IN NEW YORK CITY — L. 1892, CH. 339. The New York and Harlem Railroad Company, which, previous to the enactment of chapter 339 of the Laws of 1892, had acquired, as against the abutting owners, the right to maintain its railroad through, in and along Fourth avenue in the city of New York, through a subway constructed for that purpose, is not liable to an abutting owner for damages that may have been suffered by him by reason of any interference with his easements of light, air and access caused by the change in grade of the railroad and the erection of the steel viaduct upon which its trains are now run, the grade having been changed and viaduct erected by the state under and in pursuance of such statute for the purpose of compelling the company to operate its railroad thereon in order to give the public the use of the whole of the surface of Fourth avenue, which was impossible before the erection of the viaduct, since the state had the power to enact the statute and to change the grade of the railroad and construct the viaduct for the purpose of improving the street for the benefit of the public, without compensation to the abutting owners, and the railroad company having previously acquired the right to move its trains over the street, which could not be taken from it, did not lose that right and become a trespasser because it obeyed the command of the statute, which it could not refuse to obey, to operate its trains upon the structure which the state had built.

*Muhlker* v. *N. Y. & Harlem R. R. Co.*, 60 App. Div. 621, reversed.

(Argued October 16, 1902; decided February 24, 1903.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April 29, 1901, affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*L. M. Berkeley* and *James C. Bushby* for plaintiff, respondent and appellant. This case is not controlled by the case of

*Fries* v. *N. Y. & Harlem R. R. Co.* (169 N. Y. 270), which was decided upon the particular findings made in that case by the court below. In the case at bar there are fundamental distinctions between the two cases. (*Matter of Attorney-General,* 155 N. Y. 442; *Demarest* v. *Mayor, etc.,* 147 N. Y. 203; *Curtin* v. *Barton,* 139 N. Y. 510; *Boyd* v. *Alabama,* 94 U. S. 648.) Chapter 339 of the Laws of 1892 is unconstitutional in that it provides for the taking of private property without due process of law. (*Story Case,* 90 N. Y. 168, 171, 179; *Lahr Case,* 104 N. Y. 288; *Fobes Case,* 121 N. Y. 517; *Abendroth Case,* 122 N. Y. 17; *Bohm Case,* 129 N. Y. 587; *H. R. T. Co.* v. *W., etc., R. Co.,* 135 N. Y. 407; *Sperb Case,* 137 N. Y. 160; *C., etc., R. Co.* v. *Chicago,* 166 U. S. 226; *Tindal* v. *Wesley,* 167 U. S. 222; *Holden* v. *Hardy,* 169 U. S. 390.) Chapter 339 of the Laws of 1892 is unconstitutional in that it impairs the obligation of a contract. (*Story* v. *El. R. R. Co.,* 90 N. Y. 177; *Kane* v. *El. R. R. Co.,* 125 N. Y. 185; *White Case,* 139 N. Y. 25; *People* v. *Comrs.,* 53 Barb. 74; *Lahr* v. *M. Ry. Co.,* 104 N. Y. 290; *Fletcher* v. *Peck,* 6 Cranch [U. S.], 137; *Green* v. *Biddle,* 8 Wheat. [U. S.] 92; *Davis* v. *Gray,* 16 Wall. [U. S.] 232; *Hall* v. *Wisconsin,* 103 U. S. 5; *Wolff* v. *New Orleans,* 103 U. S. 367.) The rule of *damnum absque injuria* has no application to this case. (*Hill* v. *Mayor, etc.,* 139 N. Y. 502; *Huffmire* v. *Brooklyn,* 162 N. Y. 591; *Garvey* v. *L. I. R. R. Co.,* 159 N. Y. 332; *Cogswell* v. *N. Y., etc., R. Co.,* 103 N. Y. 10; *Lahr Case,* 104 N. Y. 293; *Bohan* v. *P. J. G. L. Co.,* 122 N. Y. 23, 24, 29; *Booth* v. *R., etc., R. Co.,* 140 N. Y. 277; *B., etc., R. Co.* v. *Fifth Baptist Church,* 108 U. S. 317; *Eels* v. *A. T., etc., Co.,* 143 N. Y. 140.)

*Ira A. Place, Thomas Emery* and *Alex. S. Lyman* for defendants, appellants and respondents. The decision of this court in the case of *Fries* v. *New York & Harlem Railroad Company* is absolutely controlling of this appeal. (*Fries* v. *N. Y. & H. R. R. Co.,* 169 N. Y. 276.) The rule of *damnum absque injuria* applies to the situation at bar.

(*People* v. *O'Brien*, 111 N. Y. 1; *Radcliffe* v. *Mayor, etc.*, 4 N. Y. 195.)

Parker, Ch. J.   The facts of this case present the same question that was before this court in the *Lewis Case* (162 N. Y. 202) and the *Fries Case* (169 N. Y. 270) and that is, whether defendant is liable for any damages that may have been sustained by plaintiff by reason of the interference with his easements of light, air and access by the erection of the viaduct upon which its trains are now being run.

Defendant was incorporated in 1831, and in 1832 it took from one Poillon a deed to a strip of land 24 feet wide in the center of what is now known as Fourth avenue, in the city of New York, along which the premises belonging to the plaintiff are situated.   Subsequently double tracks were laid thereon and trains operated, and this continued until after 1872.   In that year an act was passed (Ch. 702, Laws of 1872) under which the tracks were increased to four and were laid in a subway or cut bounded on both sides by masonry walls which rose to a height of three feet above the surface of the avenue. As soon as the work was completed the tracks were used for railroad purposes and so continued until the state compelled the road to abandon their use and to operate its cars upon the viaduct which was constructed by the state pursuant to ch. 339, Laws of 1892.

Without further reference to the history of the road in that avenue it may be said that prior to the time when the operation of its trains was transferred from the subway to the viaduct. it had acquired the right as against the abutting owners to maintain its railroad and run its trains along and over Fourth avenue.   (*Fries Case, supra*)

In 1890 Congress passed an act directing the secretary of war to cause the bridges over the Harlem river to be replaced by other bridges which should be at least 24 feet above the high water of the spring tides.   (U. S. Statutes at Large, vol. 26, p. 437.)   As defendant's road crossed one of these bridges, compliance with the provisions of this act made

necessary a change in the grade of defendant's railroad, and the act provided that such changes should be made as soon as the necessary legislation could be obtained to authorize a change in the grade of the approaches to the bridge.

About two years later the legislature passed the act already referred to by which it undertook to accomplish the result aimed at by Congress in such a manner as actually to improve the use of the street itself, a part of the scheme being to compel this defendant to operate its road upon a steel viaduct elevated above the ground, thus giving the public the use of the whole of the surface of the street which before was impossible.

This improvement was made by the state for the benefit of the public, the expense of it, by the mandate of the state, being borne by the city and this defendant in equal proportions. What was done by the state and the legal effect of its action upon the rights of this defendant cannot be better stated than it was by Judge VANN in the *Lewis Case* (*supra*) and so I quote it: '

"That structure was not erected by the defendants, but by the state, as appears from the facts already stated. South of 125th street it gave them no facilities which they did not have before. The stone structure of 1872 did away with grade crossings and gave them four tracks, and this is all they have now. The change of grade north of 125th street, in order to cross the Harlem river at the height required by the general government, has no bearing upon the change of grade south of that point. The defendants are liable for what they did but not for what the state did. (*Atwater* v. *Trustees of Vil. of Canandaigua*, 124 N. Y. 602.) The state created a board of experts and required them to make the improvement for the benefit of the public, giving them absolute control with no right on the part of the defendants to let or hinder. The board made the plans and did the work, letting their own contracts, employing and discharging their own men, without supervision or interference by the companies, which did not and could not set the board in motion, for the want of power,

if for no other reason.   The change of grade in front of the plaintiff's premises was not only for a public purpose, but was wholly in the interest of the public and not for the benefit of the defendants who had no power to prevent it.   They simply paid one-half of the expense by the command of the statute, and, hence, under compulsion of law.   They are not liable for the acts of the Park avenue board, which was not their agent, but a governmental agency of the state.   (*Benner* v. *Atlantic Dredging Co.*, 134 N. Y. 156, and cases cited on page 162.)   Their offer in advance to obey the statute did not affect its compulsive force, for obedience was their duty.   As was tersely said in a late case, the railroad company ' had no choice left to it.   The state intervened and directed that a work, which it had the power to require to be done, should be done, not by the railroad nor even by the city, but by an independent board in the creation of which the defendant had no voice, over whose selection of employees it had no control, with the discharge of whose functions it could not interfere and whose operations it was powerless to prevent.' * * *   The statute ' authorized and directed' the defendants to operate their trains on the structure ' when completed.' Accordingly they laid their tracks, at first on the trestle work, which they used for a short time, and then on the steel viaduct, which they have used ever since.   In thus using the work of the state they doubtless accepted it as their own, but they accepted it as a completed structure, and did not thereby become parties to the process of construction.   Their acceptance did not reach back and adopt the previous acts of the state, but the effect was the same as if they had purchased it from the state on the day they commenced to use it."

Although at the time of the decision of the *Lewis* case we accepted as sound the proposition that, when defendant commenced to use the steel viaduct, it started a new trespass upon the rights of the abutting owners for which it could properly be held liable, subsequent reflection persuaded the majority of the court that this was error.   The reasoning which seemed to command the latter conclusion was, briefly, that the state,

setting about making improvements in Fourth avenue which were to benefit the general public, found defendant in possession of four tracks in the middle of the avenue, with the right to operate its trains upon them, which it was enjoying. The state could not if it would — and probably would not if it could — deprive defendant of its right to operate its trains in the street. But it had the power in the public interest to compel it to run its trains upon a viaduct instead of in the subway. So the state builded the viaduct over the part of the street formerly occupied by the subway and compelled it to stop running its trains in the subway and to run them on the viaduct instead. The state had the power to do these things and all of them, and defendant, having the right to move its trains over the street, which could not be taken away from it, did not lose that right and become a trespasser because it obeyed the command of the statute, which it could not refuse to obey, to operate its trains upon the structure which the state had built.

The plaintiff was injured by the change, as appears from the findings. But who caused the injury? The defendant, which obeyed the command of the statute which it had not the right to resist, or the state, which had the power to make the changes which were made in the street and did make them and then compelled defendant to make use of them? The question admits of but one answer, and that is, it was the state.

When the question was again presented, therefore, as it was in the *Fries Case. (supra)*, we attempted to cure the error which we concluded we had made in the *Lewis* case. The opinions in the *Fries* case were written by Judge O'Brien and Judge Martin. In the course of Judge O'Brien's opinion it is said :

" I am unable to perceive any reason why the legislature had not the power to improve the avenue by removing the railroad from the cut to a viaduct, and if the change affected the rental or fee value of the property of an abutting owner having no title to the street, it was but a consequence of the improvement, for

which the railroad was not responsible.' The law is well settled in this state that where the property of an abutting owner is damaged, or even his easements interfered with in consequence of the work of an improvement in a public street conducted under a lawful authority, he is without remedy or redress, even though no provision for compensation is made in the statute. Whatever detriment the improvement may be to the abutter in such cases is held to be *damnum absque injuria.*"

Judge Martin states the principle as follows : " It must also be admitted that all the acts of the defendants for which the plaintiff claims they are liable were performed under and in accordance with the direct and express mandate of that statute. That there was no encroachment upon or actual interference with the plaintiff's premises, and that the improvement was made for the benefit of the public, and in a proper manner, are likewise practically conceded. Hence, the broad question presented is whether, in the absence of any statute providing for compensation, the defendants are liable for remote or consequential damages in having performed only such acts as were required by the express provisions of the statute upon works of a public nature, where there was neither negligence nor want of skill, and no direct invasion of any private property of the plaintiff. We think not. In every civilized community controlled by governmental or municipal laws or regulations, there are many cases where the individual must be subjected to remote or consequential damage or loss, to which he must submit without other compensation than the benefit he derives from the social compact."

The judgment was accordingly reversed. That decision was deliberately and carefully made, and reflected the view of a majority of the members of this court at that time, and still does.

The dissenting opinion cited, and correctly, the *Reining Case* (128 N. Y. 157) as authority for the proposition that " while the public authorities may raise the grade of a street for a street use, or may authorize the construction of a surface

railroad on the street, in either case without liability to the abutters, they cannot raise the grade of a street *for the exclusive use* of a railroad without compensating an abutter for the injury inflicted." But that proposition is not involved in this case. Here the state did not authorize a change in the street for the exclusive use of the railroad. The change was made for the public benefit as well as for that of the railroad, and for that reason the state compelled the city of New York to pay one-half of the expense of it.

The decisions in the elevated railroad cases are not in point. There no attempt was made by the state to improve the street for the benefit of the public. Instead, it granted to a corporation the right to make an additional use of the street, in the doing of which it took certain easements belonging to abutting owners, which it was compelled to compensate them for.

It is again urged on this appeal that the act under which these changes were made is unconstitutional, and hence that defendant need not have obeyed its commands. But that question was considered and passed upon by this court in the *Fries* case, every member of the court, whether voting with the majority or minority, agreeing that the act was constitutional. Judge O'Brien said, in discussing the constitutional question : " I think it would be difficult, in view of the authorities cited, to state any ground upon which it can be questioned." And Judge Martin commenced his opinion by saying : " Although there is a divergence of opinion among the members of the court as to some of the legal questions involved in this case, yet all agree that the statute under which the acts complained of were performed was valid, and that the legislature did not transcend its powers in enacting it." And Judge Cullen said : " The statute is not unconstitutional and no decision to that effect is necessary to secure plaintiff's rights."

We still think, under the authority of *Radcliff's Executors* v. *Mayor, etc., of Brooklyn* (4 N. Y. 195) and the other cases cited by Judge Martin in his opinion in the *Fries* case, that the state had the power to make this improvement, as it did, without compensation to the abutting owners. Undoubtedly the

state had also the power to provide in the act for compensation to abutting owners, and to apportion the expense incurred in the acquisition of the easements destroyed upon the defendant and the city of New York, as it apportioned the expenses of building the viaduct and making the other changes in the street; and it still has the power to authorize ascertainment of the damages to the abutting owners through its Court of Claims and to provide for their payment, and it may well be that it would be equitable for it to do so. But that it possessed the power to improve the street, as it did, for the benefit of the public, in the manner that it did, compelling abutting owners to bear so much of the burden of the improvement as resulted from the partial destruction of their easements of air, light and access, we have no doubt. Indeed, if in the judgment of the legislature it had seemed wise and just to do so, it could have assessed a portion of the expense of the improvement upon the abutting owners instead of placing it all upon the defendant and the city.

The judgment should be reversed and the complaint dismissed, without costs.

BARTLETT, J. (dissenting).    This is one of a large number of cases brought against the defendant railroad companies to recover damages for the erection of the steel viaduct in Park avenue, extending from near 106th street to the Harlem river, and over which the defendants operate their railroad with some two hundred trains a day.

The plaintiff recovered three thousand dollars fee damages and fourteen hundred dollars rental damages from February 16th, 1897, to October 10th, 1900, which was the date of the trial. The former date, February 16th, 1897, is the day on which the defendant companies began running their trains. The judgment of the Appellate Division was entered on the 29th day of April, 1901.

The case of *Fries* against these defendants was not decided in this court until December 31st, 1901. (169 N. Y. 270.)

The plaintiff appealed from the judgment on the ground

that he was limited in his recovery by an improper rule as to the measure of damages, the court holding that he was not entitled to recover damages prior to February 16th, 1897, the day the steel viaduct was completed.

The counsel for the defendants also appeals, contending that our decision in the *Fries* case is conclusive as to all questions presented in the case at bar, and nothing remains to be decided.

The counsel for the plaintiff attempts to distinguish these cases as follows: (1) That in the *Fries* case there was a finding that the defendants had "acquired the right, without liability to the plaintiff, to have, maintain and use their railroad and railroad structures as the same were maintained and used prior to February 16th, 1897," and in the case at bar there is no such finding; (2) that Fourth or Park avenue, in front of the premises in suit, was a public street prior to the defendants' entry into the same.

(The premises involved are situated at the northwesterly corner of Park avenue and 115th street, and the viaduct structure of iron and steel in front of these premises is about 59 feet wide, and consists of four tracks laid on a steel structure, having a mean elevation of about 31 feet above the surface of said avenue. Prior to the erection of this viaduct, the tracks in the subway were at the south line of the plaintiff's premises, about level with the surface of the avenue, and at the north line about five and one-half feet below it. This subway was completed and trains began to be operated in it in 1878); (3) that in the *Fries* case the act of 1892 was assumed to be constitutional, and in this case its constitutionality is controverted; (4) that the rule of *damnum absque injuria* has no application to this case.

The plaintiff contends that Fourth avenue was a public street at the time the Harlem Railroad Company, which is the lessor of the Central and Hudson, was organized.

Twenty-four feet of Fourth avenue, as it was then called, in front of the premises in question, were conveyed to the city July 24th, 1827, by Poillon.

In January, 1832 (the Harlem Railroad Company having been incorporated in 1831), Poillon conveyed to the Harlem Railroad Company 24 feet in Fourth avenue, but at that time he had nothing to convey; he also refers in that conveyance to, and sanctions the map of New York, filed by the commissioners in 1811 under the act of 1807.

So far as these premises are concerned, it would seem as if the only right the Harlem Railroad Company acquired in the street, if any, was a prescriptive one, that would be no broader than its actual occupation. (*Lewis Case,* 162 N. Y. 202.)

It is true that Poillon's deed to the city was never recorded, but this was not essential in order to create a highway. (*Driggs* v. *Phillips,* 103 N. Y. 77.) Furthermore, the Harlem Railroad Company could not be regarded as a purchaser in good faith and for a valuable consideration, and under the provisions of its charter and its agreement with the city, and the ordinance of the board of aldermen following the agreement, it would seem to have entered upon Fourth avenue under all the restrictions in these various documents contained, and was in no sense the exclusive owner of the fee of the street, getting title from a private grantor.

The charter of the company is found in the Laws of 1831. The agreement bears date January 9th, 1832, and the ordinance was passed by the board of aldermen on January 20th, 1832.

In less than twenty years after any of these dates the city began condemnation proceedings to widen Fourth avenue, which was then 100 feet wide, and it was proposed to add twenty feet on each side, which was condemned, and the 100 feet, representing the old street, was marked "ceded." It does, however, appear in some of these litigations that a decree of condemnation went in form against the Harlem Railroad Company as to the portion of the street occupied by it, declaring a condemnation in consideration of one dollar. This report was confirmed sometime in the year 1850.

The changes in Fourth avenue, as it was then called, and the railroad structure under the act of 1872, resulted in a new

state of affairs as to the grade of the tracks, both on viaducts and in cuts, which were not completed until 1878. It, therefore, follows that the contention of the defendants, as to undisputed title in the avenue, in front of the plaintiff's premises, cannot be maintained.

The claim that the act of 1892 is unconstitutional cannot be sustained.

If it be true that the defendants have no legal right, by reason of grant or prescription, to erect this steel viaduct to the height of 31 feet in front of the premises in question, the effect of the act of 1892 is simply, as in the elevated railroad cases, to authorize the construction of this viaduct structure in the avenue, subject to the rights of abutting owners, to the extent that their easements of light, air and access have been invaded.

The mere fact that the act does not provide for compensation has no controlling effect. The legislative sanction to construct what would otherwise be a nuisance in a public street does not imply the power to take the easements of abutting owners, which are property, without compensation.

The fundamental error in the *Fries* case is the assumption that the doctrine of *damnum absque injuria* is applicable.

In the prevailing opinion in that case the learned judge said : " So we have the case of a change of grade in a street, which necessitated a change in the location of the railroad tracks, all made under a valid statute, and that alone is said to constitute the alleged trespass."

If this statement was correct, it would be too clear for argument that the doctrine of *damnum absque injuria* would apply to this case.

The fact is that there was no change of the grade in Park avenue. The title of chapter 339 of the Laws of 1892 reads : "An act to regulate, improve and enlarge Park avenue above 106th street in the city of New York, and providing for the passage of intersecting streets, under the railroad structure of the New York and Harlem Railroad Company, *and for the elevation of said railroad structure, and for*

*changing the grade of said railroad,* and for the construction
of a new railroad bridge at an increased elevation over the
Harlem river, and providing for all changes in any avenues,
streets or railroads that may be necessary *by reason of such
change in structure and grade and increased elevation of
bridge,* and for other purposes."

It is profitable at this point to consider in detail the history
of this act.

The Federal government determined to raise the height of
the bridge which was in use by the railroad companies. The
state of New York, as in duty bound, passed this act in ques-
tion to carry out the change which Congress had decided
should take place.

This act in brief directed that the grade of the Harlem
Railroad Company's track should be raised between 106th
street and the Harlem river. This was done in order to
accommodate it to the new bridge.

The mayor of the city of New York was authorized by sec-
tion thirteen to appoint a board to be known as "The Board
of the Park Avenue Improvement above 106th street," whose
duty it was to execute contracts and superintend the construc-
tion of said improvement. Upon the completion of the work
the counsel to the corporation of the city of New York was
required by section sixteen to apply to the Special Term of the
Supreme Court in the first department for the appointment
of commissioners to determine the area of assessment to raise
money to pay for the bonds to be issued by the city in pay-
ment of its share of the work.

The act provided that the city of New York should pay
one-half and the railroad company the other half of the cost
of this work if it did not exceed a million five hundred
thousand dollars; if it exceeded that amount the railroad
company was to pay the entire excess.

As I understand the *Fries* case, the majority of the court
held (1) that this was work of a public nature, and that the
railroad company was not liable for injury to the easements
of light, air and access unless there was a want of skill, or

36

negligence, in the performance of the work; (2) that the principles of law relating to the change of grade of streets, when lawfully made, are applicable to this situation, and that the doctrine involved in the elevated railroad cases has no application.

The act upon its face shows that the legislature did not consider it was providing for a public work for which the state was to be liable. The provision that a small portion of the city and the railroad company shall pay between them the cost of this work, and if it exceeded a certain sum the excess should be paid by the railroad company, is conclusive evidence that it does not contemplate a public work, inflicting damages which can only be recovered under a special provision of law, or by showing negligence or want of skill in the performance thereof.

The raising of the bridge by act of Congress contemplated, it is reasonable to suppose, the making of the navigable tide waters of the Harlem river accessible to vessels of greater draught, with taller masts and smokestacks, thereby benefiting the city of New York and incidentally the great railroad corporations using this bridge, they being interested in the growing prosperity of the municipality and the improved facilities for entering the city of New York by land and water.

These considerations and the details of the act already referred to, lead me to the conclusion that this work was not of the character assumed by the prevailing opinions in the *Fries* case. If it were of that character, then it was unjust, and even unconstitutional for the legislature to have imposed any portion of the cost of this work upon the railroad corporations and a small section of the city of New York included in an area of assessment to be fixed by commissioners.

We thus have a situation presented similar to that in the elevated railroad cases, to wit: An elevated structure in the center of a public street, extending in places to the height of thirty-one feet, for the express purpose of elevating the railroad tracks so as to connect with the new bridge.

In my opinion to hold that the act of 1892 provides for raising the grade of Park avenue, is judicial legislation, and introduced in the *Fries* case a fact not disclosed by the act itself, and not discussed at our bar when that case was argued.

These cases present a situation covered by the case of *Reining* v. *N. Y., L. & W. Ry. Co.* (128 N. Y. 157). While the case cited does not present facts similar to the one at bar, yet the principle involved is precisely the same.

It was there held that a municipality could not, under the guise of exercising the power to alter the grade of a street, appropriate a part of the street practically to the exclusive use of a railroad company and cut off abutting owners without compensation from using any part of it in the accustomed way. In other words, this was a limitation of the power of the common council conferred upon it by the legislature in the city charter of Buffalo.

Judge ANDREWS, in applying the law of elevated railroad cases, as laid down in the *Story* case, said : " It is no longer open to debate in this State that owners of lots abutting on a street, the fee of which is in the municipality for street uses, although they have no title to the soil, are nevertheless entitled to the benefit of the street in front of their premises for access and other purposes, of which they cannot be deprived except upon compensation."

It was expressly held in the case cited that the erection of an embankment in the street, and running parallel therewith, and occupied by a railroad company, was not a change of the grade of the street.

That the legitimate change of the grade of a street, to the damage of abutting lot owners, is damage without injury, is the settled law of this state, but it involves a principle that has been condemned in many jurisdictions, and the hardship of which has been cured in some of the states by constitutional amendment providing for the payment of such damages. It is a doctrine which ought not to be extended.

I am of opinion that the law controlling the elevated rail-

road cases is applicable here and that the decision in the *Fries* case reversed a rule of property under which millions of dollars have been paid out by the elevated railroad companies to abutting owners who had no title to the street.

The New York and Harlem Railroad Company is not vested with any title in Park avenue that permits it as the owner of real estate to erect this elevated structure without regard to the injury it may work upon the easements of light, air and access enjoyed by abutting owners. They must settle for damages caused by so much of the structure as exceeds established user.

In several of the cases now before us it appears that the city received a conveyance of the fee before the railroad company took the deeds from grantors, who practically had nothing to convey. In another case there is a title under condemnation proceedings against an infant in 1830, presumably securing to the railroad company the right to operate its road on the strip twenty-four feet wide.

The details of the railroads' title were carefully and elaborately examined in the *Lewis Case (supra)*.

I am of opinion that this invasion of the easements of abutting owners has vested in them a valid claim against the railroad company, and if this court adheres to its decision to the contrary, on the ground that it was a public work ordered by the state, then these damages are a valid claim against the state.

I have no disposition to urge, unduly, the reconsideration of the principles of law laid down in the *Fries* case. I understand that the court desires a full and free discussion of this entire question. I shall be content, if a result is reached in these cases adverse to the plaintiff, so long as I place myself on record as dissenting, on the ground that it reverses the *Lewis* case and adopts a principle that is at war with the long line of decisions in the elevated railroad cases and the established law of the state.

If this judgment is reversed it should be without costs.

I vote for affirmance.

Cullen, J. (dissenting).   I concur in the opinion of Judge Bartlett and dissent from the decision about to be made.   I feel that I am not precluded from taking this course by the previous decisions of this court, for against the authority of the *Fries* case may be fairly set off that of the *Lewis* case. But the court having on this appeal re-examined the whole question involved in both the cases cited, and determined that the plaintiff is not entitled to compensation for the injuries to his property complained of, I must hereafter subordinate my judgment to that of the majority, and shall regard subsequent discussion of the question as foreclosed by the action of the court in the present case.

Haight, Martin and Werner, JJ., concur with Parker, Ch. J.; Bartlett, J., reads dissenting opinion, and Cullen, J., concurs in memorandum ; Gray, J., not sitting.

Judgment reversed, etc.